Ms. Lange was an unloader, and she worked at the Wal-Mart Distribution Center in New Hampshire. As an unloader, it was her job to get merchandise off of tractor-trailer trucks. In the first ten months of her employment with Wal-Mart, she had to take two personal leaves for injuries. She had, not injuries, but for medical conditions. She had a ruptured ovarian cyst, and she also had a possible bowel obstruction. Then about a year into her job there, she became pregnant. She went to the doctor, and the doctor suggested that she should not lift more than 20 pounds. She questioned the doctor about this because she was worried that if she went back to Wal-Mart and told them this, she might be put on unpaid leave, which was exactly what eventually happened. But at this point, the doctor said, okay, then it's not a restriction, it's just a suggestion. She went back to work, and she maintained and continued in her job as an unloader for another month. At this point, she was injured. She pulled a muscle in her uterus. She went back to the doctor, and the doctor said, now it's a restriction. You may not lift more than 20 pounds. It's at this point that Ms. Lange formally requested an accommodation from Wal-Mart. Wal-Mart denied her request for an accommodation, and it did so for one reason and only one reason, and that is because it said that her condition was temporary. Wal-Mart had a policy in place that said if your condition was going to last less than six months, it would not qualify as a disability under the ADA. Well, Wal-Mart's one reason is patently illegal. There is certainly no hard and fast time limit for the length of time a condition or impairment must extend in order to qualify as a disability. Excuse me. Her applications listed pregnancy as the reason for her disability. Well, yes. As opposed to a complication arising from a pregnancy. Ms. Lange's actual ADA request in writing did list pregnancy as the disability, but then it went on to explain in several places throughout the medical questionnaire that was attached that what was happening and what was rendering her disabled was her inability to lift more than 20 pounds. I submit that Wal-Mart was clear from day one that she was not claiming that she was disabled simply because she was pregnant, but she was claiming she was disabled because a doctor had told her she could not lift more than 20 pounds, and that's the source of the actual disability. Did the job description have the lifting of 20 pounds as an essential element of her work? No. The job description did not. In fact, Wal-Mart's job description only listed four essential functions of the job, one of which is relevant here, and that reads unloading freight from trailer manually or with power equipment, and that disjunctive is a very important or. Later in the job description, Wal-Mart does list lifting up to 60 pounds as a physical activity, which it believes was required in order to accomplish the essential functions. So what's wrong with that? But I believe that that's an error, Your Honor. I believe that what happens in this case and what has happened in other ADA cases is that there's an improper focus. The function of this job of an unloader was to unload merchandise. It didn't matter whether it was being done by hand or by machine, depending on what was needed, but it wasn't that you had to do it by hand. That was not a requirement of the job. Well, certain of their trailers had to be done by hand, as I understand it. Yes, Your Honor. But Ms. Lang put into evidence that 90 percent, there were two different types of trailers, one that was completely loaded with pallets and could be easily emptied using forklifts and mechanical equipment, another type of trailer where the merchandise was loaded from floor to ceiling and the entire trailer had to be unloaded by hand. And Ms. Lang put into evidence the fact that 90 percent of those pallet-loaded trailers could be unloaded completely with mechanical equipment. And the fact is that Walmart had the ability to give her such an accommodation and put her only on those. May I ask a few factual questions? Of course, Your Honor. Didn't it depend on the order in which the trucks came in? So they tried to unload the truck that came in first before they moved to another truck? Well, Your Honor, I believe that how the trucks were assigned and how they were unloaded and the order in which they were unloaded is a fact question for trial, a question that Ms. Lang put enough evidence in on that the jury should be allowed to decide. Don't you know the answer? Well, I do. And couldn't you have just put that in the record? Well, Your Honor, first of all, I was not counsel below. So I, as you, are limited to the facts that are in the record that were before the district court. Yes, but I'm not at risk for not having put facts in the record, and you may be. So we're trying to understand how Walmart's business model worked here. I understand. Let me address that directly. Ms. Lang put in very specific factual evidence that the way the trucks were unloaded is that there would be a stack of papers, one for each truck, and that her supervisor and sometimes a fellow co-worker would leaf through those and choose which ones to hand her and other people. And it was, in fact, this is, just to explain a little bit more, this is exactly what was happening to her as soon as she told Walmart she was pregnant. All of a sudden they kept giving her tractor trailer after tractor trailer that needed manual unloading. And for its part, Walmart simply put into the record a very conclusory statement by one of its operations managers that, in fact, oh, no, you know, trucks were unloaded in the order in which they came in and that it was random. But I submit that the evidence that Ms. Lang has presented is sufficient to reach a jury on that question of exactly how is it that these trucks were assigned. Because her testimony is that, as I said, when she first came back and said she was pregnant, she began being assigned to those trucks with much more frequency and regularity. She had very solid evidence on there. She certainly worked there long enough to know what the practice was and could testify about how her assignments were given to her. For all I know, a bunch of trucks come in which require hand unloading. She's randomly assigned, but all of the trucks just happen to need hand unloading. And the pellet unloading didn't happen to come up while she was being given assignments. I mean, is there an allegation that she was taken out of the regular order, treated differently than other employees? Yes, Your Honor. And what is that based on? That is based on her own testimony as to the types of trucks she had been assigned to work on prior to her announcing her pregnancy and post-announcing her pregnancy. And Wal-Mart itself admits in terms of the number of trucks and when they would come, and I admit that the record is a little thin on that, but Wal-Mart itself admitted that 30 percent of the trucks could be unloaded completely with mechanical equipment. So therefore, given the size of Wal-Mart, the size of that distribution center, it's very difficult to believe that they couldn't have assigned her to the non-manual trucks since they seemed to be able to assign her just to the manual ones when they wanted to. Well, that's something that I'm a little confused about because she was actually let go from her Florida position, the one she was trying to get into. I think they accommodated her to the point of actually telling her she could go to Florida where her husband had been transferred to. If I might clarify, Your Honor, what happened was that when Ms. Lange, after her pregnancy, after her maternity leave ended, she came back to work. Five months later, she injured her arm at work. She pinched an ulnar nerve, which is very painful, and it was a long-term issue for her for which she received a lot of medical treatment. So at this point, Wal-Mart has now got her pegged. In their mind, she's a malingerer who's probably taking advantage of these federal laws a bit too often. But from her perspective, of course, she was just a worker who happened to get injured again. Of course, it was no joy for her. At that point, Wal-Mart put her on light duty, which is something else they could have done for her when she first became pregnant but chose not to. Anyway, they put her on light duty at that point. At the end of 90 days of light duty, it is Wal-Mart's policy to then make a decision and this is what she had been expecting. And Ms. Rose, Andrea Rose, the head of HR, knew that when that 90 days was up, that was just about the time that the Lange family wanted to move to Florida. Mrs. Lange's husband also works for Wal-Mart at that distribution center in New Hampshire, and he had obtained a transfer to the Florida facility. Ms. Lange hoped to obtain a similar transfer. But there's also a Wal-Mart policy that says you can't transfer if you're on light duty. And Ms. Rose knew that. And so at the end of this 90-day period, she continued that light duty period beyond 90 days, well beyond any policy that Wal-Mart would – well beyond Wal-Mart's policy. She did it knowing that Ms. Lange wanted to transfer and in order to make it impossible for Ms. Lange to transfer. So that's actually what happened. Could it possibly be that they were trying to accommodate her? No, I don't believe so at all because at that point – Well, they went past their policy. Well, at that point, the other thing they did was that they denied her worker's comp claim. And this, despite the fact that in her affidavit in this court, Ms. Lange admits that – I mean, Ms. Rose, a Wal-Mart employee, admits that Ms. Lange was injured. She did injure that ulnar nerve on the job. So there's no good faith basis in the record for Wal-Mart to have denied that worker's comp claim. It all seems to be part of this orchestration that Wal-Mart had in mind. They wanted to get rid of this employee who was – Did she appeal that denial? Pardon me? Did she appeal that denial? Your Honor, as I say, I wasn't her counsel below, and I'm not entirely sure the answer to that question. Isn't that rather important? Well, whether or not she did, I believe that it still is evidence of Wal-Mart's motivations in this case. It's discriminatory animus, and it's retaliatory conduct. It's very important to note, if we go on to the New Hampshire discrimination and retaliation claims, that Ms. Lange put a large quantity of evidence into the record concerning the disparate way she was treated after she was injured and was injured multiple times. Wal-Mart took – Can we go back to the strain from lifting more than 20 pounds? Certainly. She took an aspirin, as her doctor said, and then she testifies she's fine the next morning, and she goes back to work. So can we go back to the definition of disability and how this is a disability when you're told to just take an aspirin or Excedrin, and that takes care of the problem? Well, Your Honor, I believe that the question is a little bit misfocused. Her muscle pull did resolve itself quickly, but because of that muscle pull, because of that injury, her doctor restricted her. She said, for the next seven months of your pregnancy, you are not to lift more than 20 pounds. And I believe this was because of the fear of reinjury, plus there are many other types of injuries that pregnant women can suffer, and here she was, she had shown a propensity to suffer it. And I believe that that is the complication from the pregnancy and that this is significantly different. The disability wasn't just that she pulled one muscle. The disability was the propensity to pull more and the lifting restriction. It was her inability to lift more than 20 pounds that when compared with the rest of the population, which is the test under the ADA, that rendered her disabled. We have to remember that the ADA, the regulations are very clear that even a temporary restriction, something lasting less than six months, can qualify as a disability. The ADA has said that, and the EEOC has said that. And the EEOC also puts in, as an example, in its regulations, the very type of thing we're talking about here. They put in there a 20-pound temporary lifting restriction, and they say that that qualifies. So how can it be that that would qualify if it were not pregnancy-related, but somehow just because Ms. Lang is pregnant, then it's not going to qualify? I mean, the whole point of the 2008 amendments to the ADA were to make the definition of disability easier for plaintiffs to meet. And that's what Congress was trying to do. It was trying to overturn what the U.S. Supreme Court had done in making the hurdle higher and higher. So certainly it can't be that just because Ms. Lang's disability, her inability to lift more than 20 pounds, was somehow related to a pregnancy, certainly she isn't meant to face a higher hurdle than a non-pregnant person who is seeking to proceed under the ADA. I'm still not sure I understand your theory of the logic for the defendant's actions. She asked for an accommodation. She's told no, because I don't want to have to make a similar accommodation for every guy who comes along who has a back injury and is put under this restriction. And then they start discriminating against her in retaliation for her request for something they don't give anyone? Well, as I was explaining earlier, I believe that in Walmart's mind, this employee had shown herself to be, for lack of a better word, a malingerer. Somebody who had been hurt two times, then she was pregnant, was put on a lifting restriction, then she hurt her arm. This was a physically demanding job, and this was an employee who had been hurt several times. But I don't believe that Walmart's motivations in this regard can be legitimized when we do have federal laws and state laws that protect workers in this very situation. Let me just follow that up. You just said they considered her a malingerer, but because of the initial strain out of physical aspects of being pregnant? Well, from a whole... The question is the logical connection between her claim of pregnancy disability and the steps that then take place. It sounds like you've got a case where you'd like to argue that employers can't fire malingerers, but that has little factual connection to the pregnancy disability claim. Well, Your Honor, I would argue that there's quite a connection, because she had two medical conditions that she required leave for. Then she had her disability, her complication of her pregnancy. Then she had another injury. So this was an employee who, four times in the course of a couple years, needed to be accommodated by Walmart. They didn't like that. That's expensive, and it's a pain in the neck. It's a lot easier just to get rid of her, and I believe that that's what was going on. But that's why your reasonable accommodation claim had only to do with the pregnancy claim and not the other three aspects of her injury. Well, that's true. It's a little difficult, though, to carve that out, because this is all going on in the backdrop of the discrimination and retaliation which Ms. Lang has brought forth in her New Hampshire discrimination claims. Okay, thank you. Morning, Mr. Kaczmarek. Good morning, Your Honor. Chris Kaczmarek for the defendant, Walmart Stores East. With me is my associate, Jennifer Duke. Your Honors, I'll begin where my sister left off, which is the question of whether Ms. Lang was disabled under the ADA. She argues that because she pulled a muscle while pregnant that caused her obstetrician to impose a lifting restriction that she's therefore disabled. That's simply not borne out by the record, and it's not supported by the law. What Ms. Lang testified to in her deposition is that her doctor put the lifting restriction in place at her initial appointment on October 7, 2010, a month before Ms. Lang was injured at work. That restriction did not change at all from the outset of her pregnancy throughout. At the initial visit, it was a 20-pound restriction after the muscle pull as established by the request for accommodation forms that she filed with Walmart. It was also a 20-pound restriction. There's no evidence in the record of any sort of complication or other factor related to her pregnancy that might rise to the level of a disability in this case. Now, under both the ADA and as it was... Counsel says it went from a recommendation to a medical restriction after the pull. I respectfully disagree with my sister's interpretation of the record, Your Honor. If you look at Ms. Lang's deposition testimony at A116 and 117, she's pretty clear that her doctor told her at that initial visit, you are restricted from lifting 20 pounds. But Ms. Lang said, I don't want that restriction in writing because I'm concerned about what implications that may have for me at work. And then, when she does have the muscle pull at work, she goes back to her doctor and gets that restriction in writing. I would submit that when you look at the record, there's nothing about that first meeting that suggests that it's a suggestion as opposed to a restriction, Your Honor. Now, under both the ADA before and after the Amendments Act, it's clear, and I don't think my sister would disagree, that pregnancy itself is not a disability. What pregnancy-related impairments that limit a major life activity may rise to that level. Here, there's no evidence of any kind of any sort of additional factor other than just her pregnancy in the record. In fact, as I understand my sister's argument, if she's saying essentially that any sort of lifting restriction imposed by a doctor, regardless of the source or cause of that lifting restriction, constitutes an impairment under the ADA. And I don't think that's supported by the law, Your Honor. As I see it, that analysis, if carried forward, would essentially mean that any time an obstetrician or other doctor imposed a cautionary restriction, as the Court found here, that we suggest that you not lift a certain amount going forward, that that precaution would somehow be transmuted into an impairment for purposes of the law. And the effect of that would mean... Excuse me, why do you keep harping on the suggestion versus restriction? I don't think it makes any difference to your argument. And further, it doesn't help you to say that the suggestion was really a restriction written down later. Isn't your point that whether it's a limitation imposed by the doctor or a suggestion, it still doesn't make it a disabling condition? Yes, Your Honor. I was merely discussing the suggestion component because it was raised by Judge Thompson. Okay, so why isn't this a disability? This is not a disability because Congress, when it passed the ADA, said that a disability has to be an impairment that substantially limits a major life activity. And in the EEOC's guidance, even issued after the ADA Amendments Act, the EEOC interpreted that guidance and said nothing here is intended to change the historic guidance that pregnancy in and of itself, which is the case here, is not a disability. Instead, the former rule that you have to have some sort of complications, for lack of a better term, related to your pregnancy in order to rise to the level of a disability. So why isn't this a complication? Because there's no evidence that it was anything other than a standard restriction imposed on someone at the outset of a pregnancy. If it was a standard restriction at the outset, but was nonetheless a restriction as a result of the pull, why isn't it a restriction? There was no evidence, medical or otherwise, put into the record by Ms. Lang that at the outset there was a medical-based reason, a non-pregnancy-based reason for the restriction. And with regard to the muscle... Why didn't that change? Why didn't that change after the muscle pull, Your Honor? Yes. Because at that point, as Judge Lynch noted, that muscle pull certainly in and of itself did not rise to the level of any sort of impairment. This was a one-day muscle pull that she was able to treat with ice and some Excedrin. She testified she was able to go back to work the very next day. She herself, in her interrogatory responses, characterized this as a minor injury. I don't think the ADA was intended to... But is there anything in the record... Counsel argued that it demonstrates, according to her doctor, that she now had a proclivity for this kind of injury as a result of the lifting. Is there anything in the record to support that? No, Your Honor, I don't believe there is. I believe the restrictions stayed the same throughout, and there's no evidence to suggest that she had any sort of increased risk or proclivity for muscle pulls or any other kind of medical condition. Okay. Now her theory of the case shifts from... This was actually discrimination against me because I was disabled to a retaliation theory, which you're going to have to deal with conceptually as a separate matter. Yes, Your Honor. With regard to her retaliation claim, I think it's important to take into account the multiple extensions of the personal leave of absence that were granted by the alleged discriminatory actor here, the human resources manager, Andrea Rose. She, as the lower court found, Walmart effectively bent over backwards to allow Ms. Lange to remain in her position. She was granted three separate extensions of this personal leave of absence and effectively going from February to August, six months of extensions. Those are not the actions of a discriminatory actor. There's no basis in the record to suggest that Walmart was required to give those extensions. Those were given voluntarily to allow Ms. Lange the opportunity to find a doctor who could treat her in Florida, who could provide the documentation to support her continued leave of absence. Moreover, there's no evidence in the record that Ms. Rose, the human resources person, or any sort of retaliatory animus against Ms. Lange either for her filing with the New Hampshire Commission for Human Rights or because of her request for accommodation. The statement that Ms. Lange primarily relies upon is the statement that, well, if I granted your request, I'd have to grant everybody's request. Respectfully, Your Honor, that was made before she filed her charge of discrimination with the commission. Certainly, as the lower court found, it's a factual statement from Ms. Rose's perspective. It's true. If I grant one, I have to grant them all. I don't believe I'm required to grant yours, so I'm going to treat everybody the same. I don't believe that supports a finding or creates a genuine dispute of material fact of retaliation in this case, Your Honor. The discrimination claims related to her termination are equally meritless. I want to go back to my initial question about understanding your corporate culture. Whether it's a pregnant woman or a guy, what's the problem with trying to honor a weightlifting restriction in the course of your business? There are a number of problems with it, Your Honor. First off, there are a number of trailers that come through. Some are stacked floor to ceiling, some are not. You don't know until you open up a trailer what it's going to look like. Even Ms. Lang conceded that some of the trailers that she thought she might be able to use power equipment on, sometimes she had to use manual lifting because things would break in transit or things were not packed correctly and therefore it would completely disrupt workflow. If you had a trailer assigned to one person, then you had to bring in some people after the fact to do the manual lifting that this person couldn't do. The system was essentially one trailer per person. At least that's how it was planned out originally. And how many trailers are in there at one time period? Your Honor, that's not in the record. There's no evidence in the record regarding how many trailers were in there at any given time. How many employees are unloaders? Also not in the record, although at any given shift, I believe the testimony suggests that there are at least a half dozen people who are on the shift as unloaders in one capacity or another. So there are other people performing the same job functions. And if I may, Your Honor, I'd like to address the issue of the job description, which was a large part of my sister's brief on appeal. The job description is not a legal document, Your Honor, and to suggest that this or in the job description  is not an essential function of the job description I don't believe has any basis in the law or in the facts given the testimony of both Ms. Lang and her supervisor. The EEOC and its ADA regulation says that the essential functions are the fundamental job duties of the physician. And in this case, the fundamental job duties of an unloader are to unload the trailers that come into the distribution center. And the testimony I think is clear that at least some portion of those need to be unloaded by hand. And I believe that by failing to raise that issue below, Ms. Lang has waived that issue on appeal. And I don't think there's any circumstances here that would warrant an exercise of this Court's discretion to excuse that failure to raise the argument below that this is in fact an essential function of her job. This is a fairly unique fact-based question, unique to one job at one employer. It's not the sort of broad-based constitutional question that's likely to recur in a lot of different scenarios where a relaxation of the raise or waive rule is typically invoked. Moreover, there would be prejudice here if this issue were allowed to be argued for the first time in appeal. Specifically, Wal-Mart, if it had known that there was going to be a dispute about whether lifting 60 pounds would apply to the amount of assistance is an essential function, it certainly would have put additional evidence into the record regarding job functions as well as the genesis and wording of the job description itself. If there are no other questions, I rest on the arguments in my brief. Thank you, Counsel. Thank you.